UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| EDWARD BUNDY, et al., | ) |
|       Plaintiffs | ) |
|   and | ) |
| AMERICAN LONGSHORE MUTUAL ASSOCIATION, | ) |
|       Intervenor-Plaintiff | ) |
| vs. | ) CAUSE NO. 2:07-CV-261 RM |
| TRANSPORT DESGAGNES, INC. and M/V CATHERINE DESGAGNES, | ) |
|       Defendants | ) |

## OPINION and ORDER

This cause is before the court on the motion of Transport Desgagnes, Inc. and M/V Catherine Desgagnes for summary judgment on the amended complaint of Edward and Janette Bundy. The Bundys bring their claims pursuant to the Longshore and Harbor Workers' Compensation Act, as amended, 33 U.S.C. § 901 *et seq.*, seeking to recover damages for injuries Mr. Bundy sustained when he fell on the gangway of the vessel M/V Catherine Desgagnes in the course of his employment as a longshoreman for Jack Gray Transport, Inc. Response briefs were filed by the Bundys and intervenor-plaintiff American Longshore Mutual Association, and the defendants filed their reply. For the reasons that follow, the court denies the summary judgment motion.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must construe the evidence and all inferences that reasonably can be drawn from the evidence in the light most favorable to the non-moving party, here, the plaintiffs. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." 477 U.S. at 251-252 (1986). But the existence of a factual dispute alone doesn't defeat a properly supported summary judgment motion – the disputed factual issue must be material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *See* 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). The proper inquiry, then, is "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." 477 U.S. at 250.

# FACTS

On September 4, 2005, the M/V Catherine Desgagnes, a bulk cargo carrier owned by Transport Desgagnes, Inc., was docked at the Lake & River Transfer Terminal at Burns Harbor, Indiana discharging a cargo of pig iron ingots that had been transported by the vessel to Indiana from Ontario, Canada. Edward Bundy was working that day as the terminal head checker for Jack Grey Transport, the stevedore engaged to unload the cargo. Mr. Bundy says he boarded the vessel via its gangway at 6:00 a.m. to monitor the status of the unloading operations and as he was walking up the gangway he saw a yellow rope tied around the top step; he says he believes the rope was tied loosely around the step and had a loop in it. Bundy Dep., at 68-69, 71-72. According to Mr. Bundy, he thought it was strange the rope was on the step, but he didn't mention it to any of the vessel's crew and then forgot about it. Bundy Dep., at 72-73. Around 11:00 a.m. as Mr. Bundy was leaving the vessel, he placed his left foot on the first step of the gangway and as he tried to place his right foot onto the second step, his foot got caught in the loop of the rope laying on the first step and he fell and was injured. Bundy Dep., at 63-67, 73-76.

Donald Lane, a longshoreman employed by Jack Grey Transport, was with Mr. Bundy at the time of his fall. Mr. Lane says he was walking in front of Mr. Bundy on the deck, and as he (Mr. Lane) started to descend the gangway he noticed a yellow rope around the gang plank. Lane Dep., at 15. As Mr. Lane reached the fourth or fifth step, he turned around to warn Mr. Bundy about the

rope, but Mr. Bundy had already tripped over the rope and was falling. Mr. Lane says he wasn't able to catch Mr. Bundy, but he did help break the momentum of Mr. Bundy's fall. Lane Dep., at 8-10, 16. Mr. Lane remembers that Mr. Bundy fell onto his stomach and side area with his leg wedged between two steps and needed assistance to get up. Lane Dep., at 10-13. Mr. Lane also says that after Mr. Bundy's fall, someone from the ship reported the incident to the captain and a short time later a crew member cut the piece of rope off of the gangway step. Lane Dep., at 17-18.

Longshore foreman Mark Paz was on the dock in the area of the vessel when he received a radio call that Mr. Bundy had fallen. Mr. Paz reports that when he arrived at the gangway, Mr. Bundy was sitting on the tailgate of his truck (which was parked on the dock along side the vessel). Paz Dep., at 9-10. Mr. Paz says Mr. Bundy related that he fell when he got his foot caught in a rope on the gangway, so Mr. Paz looked in that direction and saw a brownish rope looped over and hanging off the side of the gangway. Paz Dep., at 11-14, 16-17. Mr. Paz then saw someone from the ship walk over to the gangway, cut the loop of rope off, and carry it away. Paz Dep., at 14, 18. Mr. Paz reports, too, that he had observed the looped rope when he first boarded the vessel, probably around 8:00 a.m. that morning. Paz Dep., at 18.

Longshore superintendent Victor Klancer boarded the vessel early on the morning of September 4 to check the cargo and make a visual inspection of the vessel for safety. Klancer Dep., at 32. He says he didn't see a rope on the steps of

4

the gangway on his initial inspection, but admits that if the rope had been there he may not have seen it. Klancer Dep., at 32-33. Mr. Klancer was called to the scene after Mr. Bundy's fall. Upon his arrival, Mr. Klancer convinced Mr. Bundy to go to the hospital and then took some pictures of the gangway area where Mr. Bundy had fallen. Mr. Klancer reports he was told that before he arrived with the camera to take the pictures, a loop of rope was cut off the gangway by a member of the vessel's crew. Klancer Dep., at 27-30.

The vessel's captain, Pierre Casaubon, was summoned to the scene after Mr. Bundy's fall. Captain Casaubon says he walked to the gangway from his office on the vessel and as he descended the gangway to talk to Mr. Bundy, he noticed that the rope (or grommet) that's used to lift the gangway was tied to the part of the gangway that supports the steps; he says the rope was tight and there was no loop. Casaubon Dep., at 28-29. Captain Casaubon says he then ordered either the chief mate or the bosun to cut the rope/grommet so no more accidents would occur; no measurements or photographs were taken before the rope was cut off. Casaubon Dep., at 30-32. Captain Casaubon reports that as he walked back up the gangway he didn't see a rope of any kind laying across the platform or any of the steps. Casaubon Dep., at 63-64. The following day, Captain Casaubon submitted a written report of the incident to Transport Desgagnes in which he opined that "the accident was caused by Mr. Bundy's negligence as the gangway was completely safe." Casaubon Dep., at 34-35; Pltfs. Expert Rept., at 8.

5

Others of the vessel's crew members, Michael LaChance, Howard Rennie, and Donald Perry, were on duty that day, but didn't see Mr. Bundy's fall. Mr. Rennie says he didn't see a rope laying across or wrapped around the gangway steps before Mr. Bundy fell, Rennie Aff., ¶¶ 6-7, 9, 11, and Messrs. LaChance and Perry say they didn't see a rope laying across or wrapped around the gangway steps after Mr. Bundy's fall. LaChance Dep., at 16-17, 51; Perry Dep., at 74-75. Mr. LaChance reports he saw Mr. Perry cut a portion of yellow rope from between the gangway platform and the top step after Mr. Bundy's fall. LaChance Dep., at 25-28. Mr. Perry says the rope/grommet section he cut off was located between the gangway's first and second steps. Perry Dep., at 24, 41, 71, 77.

## DISCUSSION

The Longshore and Harbor Workers' Compensation Act establishes "a comprehensive federal workers' compensation program that provides longshoreman and their families with medical, disability, and survivor benefits for work-related injuries and death. The injured longshoreman's employer – in most instances, an independent stevedore – must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman. The longshoreman also may seek damages in a third-party negligence action against the owner of the vessel on which he was injured." Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 96 (1994) (citations omitted). Thus, a longshoreman may

6

bring an action against the vessel and its owner in the event of an injury "caused by the negligence of a vessel." *See* 33 U.S.C. § 905(b).[1]

The Act has been interpreted as including three general duties shipowners owe to longshoremen:

> The first, which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.' The third duty, called the 'duty to intervene,' concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

Howlett v. Birkdale Shipping, 512 U.S. at 98 (*citing* Scindia Steam Navigation Co., Ltd. v. De los Santos, 451 U.S. 156, 167-178 (1981)).

The turnover duty has two components: shipowners must (1) exercise ordinary care under the circumstances to turn over the ship and its equipment and work space in such condition that an expert and experienced stevedore would be able, by the exercise of reasonable care, to carry on its cargo operations with reasonable safety to persons and property, and (2) warn the stevedore of any

---

[1] Section 905(b) provides, in pertinent part, that "[i]n the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

hazards that are known or should be known to the shipowner in the exercise of reasonable care and that are not known to the stevedore and would not be obvious to or anticipated by him. Lincoln v. Reksten Management, 354 F.3d 262, 266 (4th Cir. 2003) (*citing* Scindia Steam v. De los Santos, 451 U.S. at 166-167). If a shipowner "fails at least to warn the stevedore of hidden danger which would have been known to [the shipowner] in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." Scindia Steam v. De los Santos, 451 U.S. at 167.

Under the active control duty, a shipowner has a duty to "to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia Steam v. De los Santos, 451 U.S. at 167. Thus, liability may result for a longshoreman's injury caused by a hazard in an area under the control of the ship. *See* Turner v. Costa Line Cargo Servs., Inc., 744 F.2d 505, 509 (5th Cir. 1984) (active control duty breach was found where longshoreman was required to "venture outside of the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a location outside of his work area").

"Lastly, even if the shipowner is not actively involved in operations and does not have active control of the vessel, if the shipowner has actual knowledge of a dangerous condition which has arisen after the turning over of the ship to the stevedore, the shipowner has a duty to intervene . . . to correct the dangerous

condition." Elberg v. Mobil Oil Corp., 967 F.2d 1146, 1150 (7th Cir. 1992). However, actual knowledge of a dangerous condition "is not enough by itself to create a duty. [I]f the shipowner has actual knowledge that an unsafe condition exists and that the stevedore is allowing that condition to continue, and if the stevedore's judgment in not remedying the condition is 'obviously improvident,' the shipowner has a duty to intervene." *Id.*; *see also* Gravatt v. City of New York, 226 F.3d 108, 121 (2d Cir. 2000) ("If the vessel knew of the dangerous condition of the winch and the 'improvident' failure of the stevedore to protect its employees from that known hazard, the vessel was under a 'duty to intervene.'") (*citing* Scindia Steam v. De los Santos, 451 U.S. at 175-177).

Transport Desgagnes claims it isn't liable to Mr. Bundy because "the evidence here is that the gangway was constantly visually inspected and was in steady use and problem-free for five hours after the stevedore began work around 6:00 a.m., until plaintiff's fall about 11:00 a.m.." Memo., at 18. According to the company, four of the six people who saw the rope after Mr. Bundy's fall say the rope loop was around the outboard ladder rail "where it would be impossible to catch one's right foot while descending the gangway because it is on the opposite side of the gangway from one's right foot." The company claims that even Mr. Bundy couldn't say exactly what he tripped on – he merely assumes it was a loop of rope. Even though Mr. Lane says he saw a rope on the gangway steps, the company says his visual of the rope occurred just prior to Mr. Bundy's fall and can't support a finding that the company knew or should have known the rope

9

was there. The company says a necessary requirement for liability is that the shipowner knew, or in the exercise of reasonable care should have known, of the alleged defective condition, and the evidence in this case establishes that no basis exists to impute knowledge to the crew that a loop of rope was on the gangway. The court can't agree.

Transport Desgagnes maintains it didn't breach either its turnover or active control duty in reliance on statements from three people who say they didn't see a rope laying on or wrapped around the gangway that day, but Mr. Bundy and Mr. Paz each say they did see the rope laying across the gangway hours before Mr. Bundy's fall, raising a question of fact as to whether the vessel's crew knew or should have known about the placement of the rope. Transport Desgagnes notes, too, that four of the six people who saw the rope after Mr. Bundy's fall say the accident couldn't have happened as Mr. Bundy claims, but none of those people witnessed the fall, and the two people who did – Mr. Bundy and Mr. Lane – both say a rope impeded Mr. Bundy's ability to safely descend the gangway, which the parties agree was under the control of the vessel's crew, creating a question of fact about whether the vessel's crew exercised due care to protect the longshoremen from harm on the gangway. Lastly, Transport Desgagnes says the duty to intervene isn't involved, but the intervenor-plaintiff argues to the contrary. ALMA claims that if a jury finds persuasive the testimony that the rope was across the gangway during the morning hours of September 4, 2005, then based on Transport Desgagnes' explanation of its operating procedures – that a crew

member was assigned to watch the gangway to make sure it was in a safe condition for anyone using it and the crew member on duty that morning observed longshoremen walk up and down the gangway at least fifty times during his shift – a jury could find that "the crew observed the longshoremen travel up and down an unsafe gangway at least fifty times and yet failed to intervene by removing the rope before the accident occurred." ALMA Resp., at 13. Genuine issues of material fact preclude summary judgment.

Based on the foregoing, the motion of Transport Desgagnes and M/V Catherine Desgagnes for summary judgment [docket # 53] is DENIED. The final pretrial conference remains set for October 19, 2009 at 2:00 p.m. (South Bend time) in the third floor courtroom in South Bend, and trial of this cause remains scheduled to commence at 9:30 a.m. (Hammond time) on November 3, 2009 in the Hammond Federal Building.

SO ORDERED.

ENTERED:  October 6, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court